[No. 29341. Department One. July 5, 1944.]

*In the Matter of the Estate of E. A. WITTE, Deceased.*[1]

[1]Reported in 150 P. (2d) 595.

G. E. *Lovell* and S. R. *Clegg,* for appellant.

*Wilkinson & Evans,* for respondent.

STEINERT, J.—In the course of probate proceedings upon the estate of E. A. Witte, deceased, his widow filed a bill of exceptions questioning the executor's final account, report, and petition for distribution. At a hearing before the court upon the matters thus presented, witnesses testified and documentary evidence was introduced. The court took the cause under advisement and later rendered a memorandum opinion. Thereafter, in accordance with that opinion, the court made formal findings of fact, from which it concluded that the executor's final account and report should be approved and that the estate should be distributed in the manner prayed for in the executor's petition. A decree of distribution was entered accordingly, and the widow thereupon appealed.

The assignments of error protest that the trial court erred in finding (1) that the property of the estate was the separate property of the deceased, rather than community property; (2) that the inventory filed by the executor was a full and true inventory of all the assets of the estate; (3) that the amount of state and Federal taxes paid by the executor constituted the proper amount to be so paid; and (4) that the services of the executor and its attorneys were reasonably worth the amounts allowed therefor by the court.

E. A. Witte died in Whitman county on January 9, 1942, at the age of eighty-two years. He left surviving him his widow, Mary Witte, the appellant herein, and three children, Adam Witte, Clarence Witte, and Eva Kerns, the youngest of whom, Clarence, is now about thirty-nine years of age.

Mr. Witte and the appellant were united in marriage on October 26, 1898. At the time of the marriage, Mr. Witte owned, as his separate property, four hundred eighty acres of land. Thereafter, and during the period between 1899 and 1916, he acquired by purchase and by mortgage foreclosures, at different times, various other tracts of land. In that same period he inherited from his mother approximately one hundred fifty acres which, in 1931, he gave to his daughter and one of his sons. At the time of his death, he owned of record eleven hundred seventy-eight acres.

By his will, executed December 3, 1940, Mr. Witte made provision for the disposition of an estate consisting of cash, securities, and real property, the total appraised value of which amounted to approximately $265,000.

The present litigation has its source in certain provisions in the will reading as follows:

"III. I hereby declare that all property, both real and personal, owned by me is *my separate property,* the same having been acquired either prior to my marriage, inherited by me, or acquired by purchase with the rents, issues and profits of such property owned prior to marriage and inherited, or with the accumulations therefrom. I also hereby declare that my wife, Mary Witte, is the owner of separate property, both real and personal, which she inherited or acquired by purchase from the rents, issues and profits of such inherited property; and that during all times of my married life my said wife and I have kept the rents, issues and profits of our respective properties separate and apart, and the same have never been commingled.

"IV. In view of the fact that my wife is well off in her own right, I therefore bequeath to her only the sum of $5,000.00.

"V. I give, devise and bequeath to my three children; namely, Adam Witte, Clarence Witte and Eva Kerns, and to their heirs and assigns, all the rest and remainder of my property, both real and personal, share and share alike." (Italics ours.)

The will was what is commonly known as a nonintervention will and designated The Old National Bank &

Union Trust Company of Spokane (The Old National Bank of Spokane), the respondent herein, as executor.

At the time the will was admitted to probate, January 26, 1942, Mrs. Witte, who was then personally present in court, was intending to institute a contest proceeding, upon the theory that the greater part of the Witte estate was community property. In order to obviate such contest, however, she and the three children, personally and through their respective attorneys, in open court entered into a written stipulation, the material provisions of which read as follows:

" . . . that upon the payment of *all inheritance taxes, income tax, claims and costs of administration,* said Mary Witte is to receive as her share of said estate one-fourth of the property *as inventoried,* but that same is to be paid to her in cash, and that the land will all go to the children, and her one-fourth shall be of the *net estate as inventoried* after the deduction and payment of all expenses as above provided, and it is understood that any bequests made in the will of said E. A. Witte to Mary Witte shall be included in the one-fourth as part of the above settlement;

"Further stipulated that any land that was in the name of E. A. Witte, deceased, prior to his marriage to Mary Witte is not to be included in any of the above settlement or by inheritance and that the estate is to be distributed along the lines above provided.

"It is further stipulated by all parties concerned that The Old National Bank of Spokane shall act as executor regardless of the character of the estate *as later determined.*" (Italics ours.)

On March 11, 1942, the executor filed its "General Inventory and Appraisement," showing cash on hand, at the time of the testator's death, amounting to $168,039.59; bonds, stocks, notes, and accounts, amounting to $4,523.67; and miscellaneous personalty amounting to $110; making a total amount of personal property appraised at $172,-563.26. The inventory and appraisement also included thirteen tracts of land, eleven of which were farm lands and the other two of which were town properties, the entire real estate being appraised at $93,275. The total appraisement, covering both real and personal property,

thus amounted to $265,838.26. All of these assets were inventoried, appraised, and reported as the separate property of Mr. Witte.

On June 9, 1943, the executor filed its final account, report, and petition for distribution, and on December 13, 1943, filed a supplemental report. The report as supplemented showed, among other things, that the executor had paid to the state of Washington inheritance taxes amounting to $11,694.98; gift taxes amounting to $119.25 on account of gifts made immediately prior to the testator's death; and $12,104.22 taxes exacted by law for gifts made within an extended period prior to his death. The report further showed that the executor had paid Federal estate taxes amounting to $60,917.19, and Federal gift taxes amounting to $54,426.81 similarly exacted for gifts made within the extended period prior to the testator's death. The total of all these taxes amounted to $139,262.45, which was paid by the executor out of the cash on hand.

As will appear in more detail a little later herein, the foregoing items of $12,104.22 and $54,426.51 were taxes computed and exacted by the Federal and state governments, respectively, on account of gifts alleged to have been made by Mr. Witte to his children a number of years prior to his death.

In computing the total amount of the estate left for distribution equally among Mrs. Witte and the three children the executor included as an existing component part of the estate an amount equal to the two aforementioned tax charges of $12,104.22 and $54,426.51. It also included, as a part of such total amount for distribution, a sum equal to $32,250 which represented gifts made to the children within two years immediately preceding the decedent's death. In other words, for the purpose only of computing the total amount to be equally divided and distributed among the four surviving members of the family in accordance with the terms of their stipulation, the three amounts just mentioned were added to the net inventoried estate left after payment of all taxes and expenses of administration, thus giving Mrs. Witte the full benefit of one-fourth

of the net estate *as inventoried,* together with one-fourth of these superadded amounts.

On the basis of this computation, the account and report, as supplemented, showed that, after the payment of all taxes and expenses of administration and after deducting the amount of the appraised value of the real estate acquired by Mr. Witte before marriage, there remained an estate valued at $185,870.49 for equal distribution among the four heirs. This included both real and personal property. Of this amount, Mrs. Witte was, by the terms of the stipulation, entitled to one-fourth, or $46,467.62, in cash. The residue, consisting of any remaining personal property and all of the real estate *as inventoried,* was to be distributed to the three children in equal undivided shares. The decree of distribution approved the account and report and then directed that the estate be distributed as provided therein, upon the theory that the assets of the estate were the decedent's separate property, but that the division and distribution thereof were controlled by the stipulation made between the heirs, giving each a one-fourth share.

The executor's supplemental report, filed December 13, 1943, on which day the decree of distribution was entered, showed that the executor then had on hand, in cash, the sum of only $31,468.76, which was approximately $15,000 less than the amount necessary to pay Mrs. Witte her one-fourth portion as ordered in the decree. That deficit would, of course, in some way have had to be satisfied by the three children if Mrs. Witte had signified her willingness to accept the amount awarded to her by the court in its decree. At any rate, the children could not obtain full and clear title to the lands distributable to them, until Mrs. Witte had received her portion of the estate in cash.

It is apparent from what has thus far been related that, if the executors' final report is complete and correct, and if distribution is made as directed by the final decree, Mrs. Witte will have received all that she is entitled to receive, because of the stipulation into which she entered at the beginning of the probate proceedings, for, regardless of whether any part of the estate *as inventoried* is now held

to be community property or separate property, she is in either event to be paid a one-fourth part thereof in cash. She vigorously contends, however, that the executor's final report, which the decree of distribution approved, is faulty, incomplete, and incorrect in several respects and that she is entitled to receive an amount much greater than that specifically awarded to her under the decree.

In support of her contention she claims that, during the period between 1922 and the time of Mr. Witte's death, he placed of record in the names of his children large amounts of real property, not included in the inventory, which had been acquired by him during the early period of his marital status; that these additional properties constituted community property; that, in fact, all of the property acquired by Mr. Witte subsequent to his marriage, whether standing of record in his name or not, except that which he inherited, was community property, in which she had by law a one-half interest, or, under the stipulation, a one-fourth interest; further, that, in reporting and treating the various properties, whether inventoried or not, as separate property, the executor has paid excessive taxes both to the Federal government and to the state government; and that, if the executor had paid such taxes on the basis of the property being community property, instead of separate property, a less amount of taxes would have been payable and her distributive portion of the estate would have been proportionately greater. These contentions require some further delineation of the evidence in the case as shown by the record. We may say at the outset, however, that this evidence is not only in dispute in many of its details but also, at best, is somewhat vague, indefinite, and uncertain.

As stated above, the marriage between Mr. Witte and the appellant took place in 1898. The four hundred eighty acres of land which Mr. Witte owned at that time is referred to in the testimony as the "home place." The three children were born, respectively, in 1899, 1902, and 1905. From the time of the marriage until 1905, Mr. Witte farmed the home place, presumably employing hired help. After

1905, he rented the place, probably on a share-crop basis, but reserved the residence thereon together with six adjoining acres, on which he maintained a garden, a quantity of livestock, and some chickens. Between 1899 and 1905 he acquired four additional tracts of land aggregating four hundred seventy-six acres, which he operated during that period in the same manner as he had operated the home place. In 1907, he procured twelve acres, and, between 1911 and 1916, he acquired another tract of land containing two hundred ten acres. In the meantime, he had inherited from his mother a farm consisting of one hundred fifty acres. His only source of income during all this time was these various tracts of land, a part of which he himself farmed until 1905, and all of which, except the six acres, he thereafter until his death either rented to other persons or else permitted one or both of his sons to operate under an arrangement more or less indefinite, and to which we shall refer in greater detail a little later. The lands which Mr. Witte purchased were, concededly, acquired with moneys realized from his farming operations, conducted either directly, and, at times, with the aid of his children, or else through renters.

It appears that some rift in the relations between Mr. and Mrs. Witte occurred about the time that he began renting his various farms in 1905, although neither the cause of the trouble nor its exact result is revealed by the record. The testimony of the three children was, in substance, that from their earliest recollection their mother, the appellant, was seldom at home, except at night or during the winter seasons; that she spent most of her time at her own mother's farm, some five miles distant, and there helped in the farming operations; that when at home appellant lived separate and apart from Mr. Witte, she occupying quarters upstairs, and he downstairs; that she never ate her meals with the rest of the family; that Mr. Witte did all of the cooking and household work, with the aid of the children when they became old enough to assist.

Mrs. Witte, on the other hand, testified that, during the first seven years after her marriage to Mr. Witte, she bore

and nurtured the three children named above and during that same period helped do the chores, milked the cows, raised chickens, worked in the garden, and did the cooking, not only for the family but also for the harvest hands; that, although she and her husband had separate rooms throughout the years of their married life, they often slept together, until he became sick about five years before his death; that she continued to do the cooking in the home until Mr. Witte was taken to the hospital; that prior to 1922 she visited her mother only about once a week, and did very little work upon the mother's farm until she herself came into ownership and possession of it by inheritance from her mother in the last mentioned year. The trial judge, after hearing the evidence on this subject, stated in his memorandum opinion that the "community efforts" of Mr. Witte and the appellant were confined to the six acres adjoining the home; that such community efforts were inconsequential; and that any income derived therefrom was consumed in the support and maintenance of the family and the community. The court subsequently made an express finding of fact to the same effect.

From 1905 to 1916 all of the above-mentioned lands, with the exception of the six acres, were farmed by tenants. In 1916, the older son, Adam Witte, took over the operation of a part of the home place and in 1923 took over the remainder of it, under some kind of oral agreement. This agreement between the father and the son, in so far as we can determine from the recorded testimony, provided that Mr. Witte was to retain the income from the land, and when the children became of age he was to give the land to them or else give them money with which to buy other lands for themselves. This general plan with respect to the operation of the home place and also with respect to certain other parcels of land which Mr. Witte had acquired by deed was followed systematically for many years, up to as late as 1935. For the greater length of time, however, the lands acquired by Mr. Witte were farmed by tenants. His idea always seems to have been to retain the income from all the lands as far as possible and by

means thereof purchase other lands from time to time. At any rate, that is apparently what he did.

In the meantime, about the year 1918, or possibly earlier, Mrs. Witte received an inheritance of about nine thousand dollars from her father. Then, in 1922, she inherited from her mother the eighty-acre farm, to which in earlier years she had devoted a portion of her time, and also received some cash from the same source. With the moneys which she received by inheritance, totalling about twelve thousand dollars, she purchased a four hundred eighty acre farm in 1933. She still owns this farm and has always retained the rental proceeds therefrom as her separate property. In 1935, or thereabouts, she sold the farm which she had inherited from her mother, receiving six thousand dollars therefor. That money she likewise has retained as her own. It will be noted that these several transactions in which Mrs. Witte was involved occurred from five to twenty-two years prior to the execution of the will by Mr. Witte.

Beginning about the year 1918, and continuing thereafter for many years, Mr. Witte acquired from time to time what is termed life-estates in a number of parcels of land other than those inventoried in the estate. We gather from the record that these parcels aggregated several hundred acres. It appears that these lands were deeded by third parties to Mr. Witte's children. The children were not the actual purchasers, however, for it is apparent from the record that although they were living at home with their father they had no independent means. It was stipulated by the parties during the course of the trial that Mr. Witte had furnished the money consideration for the purchase of these lands, under an oral agreement with his children that he should have the rents, issues, and profits therefrom until he died; that this agreement was performed; and that Mr. Witte did actually receive the rents, issues, and profits. This method of acquiring additional properties seems to have been a projection of Mr. Witte's original plan, followed throughout many years, of retaining all the rents, issues, and profits from the various lands, derived either

from rentals or from the personal efforts of himself and his children, with the understanding that the children would receive the properties upon his death.

The dispute with respect to these additional lands seems to have had its origin in certain proceedings initiated by the Federal government upon Mr. Witte's death. In determining the amount of Federal estate and gift taxes, the collector of internal revenue took the position and, after an extended controversy with the executor, insisted that these additional lands, taken in the names of the children, though never actually owned by Mr. Witte, were nevertheless subject to Federal tax by reason of his retention of the rights to the income therefrom during the period of his life. Upon that theory the government assessed a tax upon these lands *at their full value* as of that time, namely, $188,671.75. The tax upon that item alone amounted to $54,426.51, which the executor paid. When the state, through its inheritance tax department, learned of the action taken by the Federal government, it preferred a similar claim, demanding an additional tax of $12,104.22. This, likewise, the executor paid. As already stated, however, the executor did not charge these two tax items against the estate, in so far as it would thereby affect Mrs. Witte's proportionate distributive share of the property as inventoried. As also hereinbefore stated, the executor credited to the estate, for the purpose of the division and distribution under the stipulation, the sum of $32,250, representing gifts which Mr. Witte had made to his children shortly before his death. It should be stated, however, that the $188,671.75 above mentioned did not represent the actual amount of money given to the children, or the actual amount paid for the purchases of the additional lands, but simply the value of those lands at the time of Mr. Witte's death. The lands were acquired many years ago, during periods when, as is now a matter of common knowledge, the prices of such properties were considerably less than they were in 1942.

Upon this statement of the case, which is as near as we can approximate the situation from the evidence, we come

to the law applicable thereto. Appellant's first contention is that the trial court should have held that all of the property acquired by Mr. Witte and all of the assets of the estate, *as inventoried*, with the exception of the land owned by Mr. Witte at the time of his marriage and that inherited by him from his mother, were community property, and that under the written stipulation referred to above she was entitled to a one-fourth part of the community property, payable in cash. Her contention is based upon the expressed theory that all of the property, other than that above excepted, was acquired after marriage; that it was acquired, in part at least, through community efforts; and that, since the income derived from Mr. Witte's separate property was commingled with funds derived through such community effort, the property purchased with such commingled funds became community property.

Inasmuch as Mrs. Witte will, in any event, receive a one-fourth part of the net estate *as inventoried*, this contention is important only because of its bearing on her other contentions.

A proper disposition of cases of this nature is always fraught with difficulty. However, there are certain rules, generally applicable thereto, which this court has frequently enunciated and consistently followed. We take occasion once more to assemble and state these rules.

■ Property and pecuniary rights owned by either husband or wife before marriage or acquired afterwards by gift, bequest, devise, or descent, with the rents, issues, and profits thereof, are his or her separate property; and all other property acquired after marriage by either spouse is community property. Rem. Rev. Stat., §§ 6890, 6891, 6892 [P. C. §§ 1432, 1424, 1433]. *DuPont de Nemours & Co., Inc. v. Garrison*, 13 Wn. (2d) 170, 124 P. (2d) 939.

■ The status of property, whether real or personal, is to be determined as of the date of its acquisition. *Katterhagen v. Meister*, 75 Wash. 112, 134 Pac. 673; *Folsom v. Folsom*, 106 Wash. 315, 179 Pac. 847; *In re Brown's Estate*, 124 Wash. 273, 214 Pac. 10; *In re Woodburn's Estate*, 190 Wash. 141, 66 P. (2d) 1138; *In re Finch's Estate*, 198 Wash.

567, 89 P. (2d) 218; *In re Binge's Estate*, 5 Wn. (2d) 446, 105 P. (2d) 689; *Conley v. Moe*, 7 Wn. (2d) 355, 110 P. (2d) 172, 133 A. L. R. 1089; *DuPont de Nemours & Co. Inc. v. Garrison, supra; In re Dewey's Estate*, 13 Wn. (2d) 220, 124 P. (2d) 805; *In re Pugh's Estate*, 18 Wn. (2d) 501, 139 P. (2d) 698.

The status of property, when once fixed, remains so in character until changed by deed, by agreement of the parties, by operation of law, or by the working of some form of estoppel. *In re Binge's Estate, supra; Conley v. Moe, supra.*

Separate property continues to be separate property through all of its changes and transitions so long as it can be clearly traced and identified, and its rents, issues, and profits likewise are and continue to be separate property. *In re Brown's Estate, supra; Rogers v. Joughin*, 152 Wash. 448, 277 Pac. 988; *State ex rel. Van Moss v. Sailors*, 180 Wash. 269, 39 P. (2d) 397; *In re Dewey's Estate, supra; In re Pugh's Estate, supra.*

Property acquired by purchase during the marriage status is presumed to be community property, and the burden rests upon the spouse asserting its separate character to establish by clear and satisfactory evidence his or her claim to the contrary. *Ballard v. Slyfield*, 47 Wash. 174, 91 Pac. 642; *Denny v. Schwabacher*, 54 Wash. 689, 104 Pac. 137, 132 Am. St. 1140; *In re Slocum's Estate*, 83 Wash. 158, 145 Pac. 204; *Seaton v. Smith*, 186 Wash. 447, 58 P. (2d) 830; *DuPont de Nemours & Co., Inc. v. Garrison, supra; In re Dewey's Estate, supra.*

Where separate funds have been so commingled with community funds that it is no longer possible to distinguish or apportion them, all of the commingled fund, or the property acquired thereby, is community property. *Yesler v. Hochstettler*, 4 Wash. 349, 30 Pac. 398; *Doyle v. Langdon*, 80 Wash. 175, 141 Pac. 352; *In re Buchanan's Estate*, 89 Wash. 172, 154 Pac. 129; *In re Carmack's Estate*, 133 Wash. 374, 233 Pac. 942; *In re Gulstine's Estate*, 166 Wash. 325, 6 P. (2d) 628; *DuPont de Nemours & Co., Inc. v. Garrison, supra.*

■ The rule last above stated is subject to the qualification that, when the community property is inconsiderable in comparison with the separate property, the mass remains separate property. *In re Binge's Estate, supra.*

In applying these rules to the instant case, we think the following facts are definitely established by the evidence: At the time of his marriage in 1898, Mr. Witte owned as his separate property four hundred eighty acres of land, designated as the home place. He, with Mrs. Witte, lived upon and farmed the home place until some time in 1905, a period of about seven years. During that period he acquired by purchase four hundred seventy-six additional acres. These additional lands were purchased with moneys derived from his farming operations upon the home place. In 1905, he discontinued his personal activities of farming and thereafter operated his farms through renters or, at times, partly through his son Adam. Between 1907 and 1916 he acquired two hundred twenty-two acres with moneys derived from his farming operations conducted entirely on a rental basis. During that same period, or earlier, he also inherited one hundred fifty acres, which he likewise rented to others. The land which he inherited from his mother he disposed of prior to his death; the remainder of the lands, amounting to eleven hundred seventy-eight acres, he still owned at the time of his demise.

From 1905 until a short time before his death, he and Mrs. Witte and their three children continued to live upon the home place, that is, they occupied the home with the six adjoining acres. The income from the home place during the six or seven years that Mr. Witte farmed it himself was never apportioned, divided, or allocated as between the rental value of the farm and the earnings derived through personal efforts, but was always kept together in lump sum. Portions of this lump sum were invested in other lands comprising four hundred seventy-six acres purchased prior to 1905. Likewise, the income derived from all lands purchased or owned after 1905 was never segregated from the returns acquired prior to that year, but was continuously kept in one common mass, either as

money or as additional lands. After 1916, the same program, with more or less variation, was continued, but always with the same purpose and effect. It is now wholly impossible to segregate these various moneys or properties so as to designate what part or proportion of them was Mr. Witte's separate property at the time of his death, and what part was community property.

■ Unquestionably, the four hundred eighty acres originally owned by Mr. Witte and the one hundred fifty acres subsequently inherited by him from his mother remained his separate property throughout the years that he retained them. Appellant makes no claim to any interest in the title to those properties. Unquestionably also, Mr. Witte would have been entitled to retain as his own the "rents, issues, and profits" of his separate property, had he kept them separate, that is to say, after 1905, when he rented his separate property, the rents were likewise his separate property, and he could have retained them as such had he kept them separate.

He was not, however, entitled to retain, as his separate property, all of the earnings from those properties during the period when he, with his wife, was actually farming them. Such earnings, though the result of his personal labors, were community property.

We are not impressed with the contention made by the respondent executor that the community efforts were devoted solely to the six acres and that such community efforts were inconsequential, or that the income therefrom was consumed in the support and maintenance of the family. Mrs. Witte testified that she milked the cows, fed the stock, worked the garden, and did the cooking, not only for the family but also for the harvest hands, and we are inclined to the belief that her testimony is true. Besides, she bore three children between 1898 and 1905. Whatever assistance the children may have rendered in later years, they certainly rendered none before 1905. In that period they were financially and materially a burden rather than a benefit. Mrs. Witte took care of them, and there is no satisfactory evidence to the contrary. But whether or not

she rendered the manual assistance referred to above is immaterial, for, even if she did not, the personal earnings of the husband nevertheless belonged to the community. Nor can those personal earnings be held to be inconsequential, for the record discloses that with them four hundred seventy-six acres of land were acquired prior to 1905.

 Since the income from the home place during that period represented both the earnings by personal effort and the rental value of the property, and since there was never any segregation as between the two items, and since the entire amount was continuously devoted as a whole to the acquisition of other lands which were treated in the same manner, and since it is now impossible to disentangle, separate, or apportion the component parts of the mass and thereby designate how much is separate property and how much is community property, it must all, with the exception of the original four hundred eighty acres, now be considered as community property. As stated before, this conclusion does not affect the division of the estate *as inventoried,* because, regardless of the character of the estate, its division and distribution among the four heirs are the same in any event, by virtue of their stipulation. We hold, however, that the net estate *as inventoried* should have been distributed as community property, not as separate property.

In coming to this conclusion, it is but proper that we refer to the several contentions made by the respondent executor in opposition to the foregoing contentions of the appellant. One of respondent's contentions is that Mr. Witte had the right to all of the profits and income from his separate property and, having that right, he necessarily had the further right to invest and reinvest that income. That is true, as far as it goes, but, as stated above, Mr. Witte commingled the "profits" of his separate property with community earnings and then invested and reinvested the whole amount in other property, so that now the identity of his separate property, with the exception noted above, cannot be distinguished from that of the community property.

■ Respondent further contends that Mr. Witte's declarations in his will must be given weight. But his declarations cannot outweigh his actions. Moreover, his declarations, in so far as the present issue is concerned, are merely self-serving statements. Such statements are incompetent under the hearsay rule. *Reese v. Murnan,* 5 Wash. 373, 31 Pac. 1027; *Levy v. Simon,* 119 Wash. 179, 205 Pac. 426; *Allen v. Dillard,* 15 Wn. (2d) 35, 129 P. (2d) 813.

■ Respondent also contends, as we understand its argument, that by her stipulation appellant became bound to accept one-fourth of the estate "as inventoried," and that, since the estate was inventoried as separate property, she cannot now assert that it was community property. A sufficient answer to that argument is that the stipulation was made *before* the inventory was ever taken and had reference to an estate *to be inventoried,* not to one that had already been inventoried. Furthermore, it is clear from the stipulation itself that the character of the estate was to be determined *after* the inventory was completed.

■ Respondent further contends that, not having filed any claim in the estate, appellant cannot now ask for relief. Mrs. Witte's present claim is not *against* the estate, in the sense that she is a creditor thereof. Her claim is rather that there should be brought *into* the estate certain assets belonging to it, in consequence of which the whole thereof, after payment of the necessary expenses and charges, would be distributable according to law and the stipulation of the parties. Her claim in that respect was sufficiently and timely presented by her bill of exceptions to the inventory.

■ Respondent also contends that appellant, having elected to take under the will, is now bound by that election. But Mrs. Witte did not actually take anything under the will. To the contrary, she effectually relinquished the five thousand dollar bequest provided for in the will, when by her stipulation she agreed to take instead one-fourth of the entire net estate. That is what she is asking now.

Her right in that respect is denied by the decree of distribution, and from that decree she has appealed.

Finally, respondent contends, in this connection, that, having without objection permitted Mr. Witte over a long course of years to deal with the property as his separate property, appellant is now estopped to assert the contrary. There is no estoppel here. Mr. Witte, being the husband, had the management and control of the funds derived from community earnings and was entitled to invest and reinvest them. But he had no right to full and exclusive ownership thereof, nor did he have the right to give them away. *Marston v. Rue*, 92 Wash. 129, 159 Pac. 111; *Daniel v. Daniel*, 106 Wash. 659, 181 Pac. 215; *Parker v. Parker*, 121 Wash. 24, 207 Pac. 1062; *Occidental Life Ins. Co. v. Powers*, 192 Wash. 475, 74 P. (2d) 27, 114 A. L. R. 531.

So far as is shown by the record, it is doubtful that Mrs. Witte ever knew exactly what Mr. Witte was doing with the earnings of the community. Moreover, there was nothing that she legally could have done to prevent him from making the investments which he did make. She is now simply asserting her right to her portion of those investments, under the rules set forth above.

This concludes our disposition of the questions presented under appellant's first assignment of error. Her second assignment is that the real estate standing in the names of the three children, but purchased with funds supplied by Mr. Witte, should have been inventoried in the estate. This question was not passed upon by the trial court for the reason that it had already decided that the entire estate was Mr. Witte's separate property.

Appellant does not here contend that she is at this time entitled to a decree awarding her a one-fourth interest in those specific properties, but merely that she is entitled, under the showing reflected by the record, to have those properties, or the community's interest therein, inventoried in the estate and their title determined. We think her position is well taken. The evidence submitted to the court was at least sufficient to make a *prima facie* case of the

fact that these properties, or some interest therein, belonged to the estate. The court should therefore have required the executor to inventory them or the interest of the estate therein and in some appropriate action determine the title thereto before entering a final decree of distribution.

By her third assignment of error appellant contends that the executor should be charged with overpayment of taxes to the Federal and state governments. The facts underlying that contention have already been stated. That question, likewise, was never reached nor decided by the trial court, for the reason already given. Involved in that issue are certain equities and considerations which should be weighed by that court. We therefore will not pass upon the question until the superior court has made its decision thereon.

Finally, appellant contends that the fees allowed the executor and its attorneys are excessive. With that contention we do not agree. Appellant's counsel stated at the trial that he would leave that matter to the court. Evidence was taken as to the amount of services performed by the executor and its attorneys and thereupon the court fixed the amount of the fees. We think the amounts allowed are well within a reasonable limit for the services performed up to that time.

The decree is reversed, with direction to the trial court to proceed further in a manner consistent with the views herein expressed.

SIMPSON, C. J., BEALS, JEFFERS, and GRADY, JJ., concur.